UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ALISON FRANCISCUS,

      Plaintiff,

v.                              Case No.

CITY OF JACKSONVILLE, FLORIDA,
a political subdivision created
pursuant to the Florida Constitution
and laws of the State of Florida,

      Defendant.

_____ /

## COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, ALSION FRANCISCUS ("Plaintiff" and/or "FRANCISCUS"), by and through undersigned counsel, and files this civil action and respectfully requests this Court to issue injunctive relief and damages for violations of the United States Constitution perpetrated by Defendant, CITY OF JACKSONVILLE, FLORIDA ("Defendant" and/or "JACKSONVILLE") and alleges in support:

## I.  INTRODUCTION, JURISDICTION, AND VENUE

1.     JACKSONVILLE operates and controls Jacksonville Animal Care and Protective Services ("ACPS"), which provides a variety of services, including but

not limited to the operation of an Animal Care and Adoption Center and Volunteer Program.

2.      Jacksonville's Animal Care and Adoption Center ("Animal Shelter") purportedly provides shelter for homeless and lost pets and has engaged the public through a Volunteer Program ("the Program") to further assist in some of the operations of the Animal Shelter.

3.      Volunteers are required to be qualified to participate in the Program by undergoing a thorough application process, which includes a criminal background check, interview, orientation, and training.

4.      Volunteers can donate their time in a variety of positions, some of which include direct interaction with, and observation of, animals housed in kennels within the Animal Shelter.

5.      Volunteers are non-compensated workers and often donate their time due to their individual love of animals and desire to improve the lives of the animals within the Animal Shelter.

6.      JACKSONVILLE has terminated volunteers, including FRANCISCUS, who personally witnessed and publicly disseminated information regarding inhumane conditions  in which the "sheltered animals" in the custody and care of the Animal Shelter are maintained and inhumane manner of keeping practices.

7.     Upon information and belief, JACKSONVILLE terminated these volunteers, including FRANCISCUS, for the sole purpose of silencing public criticism of the management of its Animal Shelter and public criticism of inhumane treatment of the animals in its care and custody.

8.     FRANCISCUS seeks damages and injunctive relief enjoining Defendant from violating Plaintiff's rights to freedom of speech guaranteed by the First and Fourteenth Amendments to the United States Constitution.

9.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983.

10.    This Court has jurisdiction under, and by virtue of 28 U.S.C. §§ 1331, 1343 to order an injunction, compensatory and punitive damages, attorney's fees and court costs, expenses, pre-judgment and post-judgment interest, and any other legal and/or equitable relief this Court deems appropriate.

11.    Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) as the Defendant exists in this District and the events that give rise to Plaintiff's claims arose in this District.

12.    This Court is authorized to issue injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.

13.     This Court is authorized, pursuant to 42 U.S.C. § 1988, to grant Plaintiff's prayer for relief regarding vindication of civil rights including reasonable attorneys' fees and court costs.

## II. PARTIES

14.     Plaintiff, ALISON FRANCISCUS ("FRANCISCUS"), is a natural person and resident of Jacksonville, Florida.

15.     Defendant, CITY OF JACKSONVILLE, FLORIDA, is a political subdivision of the State of Florida, and is the local animal control authority which operates and controls ACPS and its Animal Care and Adoption Shelter.

## III. GENERAL FACTUAL ALLEGATIONS

16.     FRANCISCUS is an animal welfare advocate who volunteers her time to save the lives of neglected, abused, and homeless dogs and cats, and to improve the lives of sheltered animals during their periods of confinement at animal shelters.

17.     FRANCISCUS volunteered at the Animal Shelter from September 2023 to November 2023.

18.     At all times material hereto, Michael Bricker ("Bricker") was the Director of the Animal Shelter and an agent and employee of JACKSONVILLE,  acted within the course and scope of his employment, and had authority to terminate Plaintiff's volunteering opportunities.

19.   Also at all times material hereto, Franny Buffa ("Buffa") was an employee of JACKSONVILLE working at the Animal Shelter, and had the means and opportunity to adversely affect FRANCISCUS's position as a volunteer at the Animal Shelter.

20.   FRANCISCUS considers her volunteer work at animal shelters to be an important societal benefit.

21.   The conditions at a local animal shelter are a matter of legitimate public concern.

22.   While a volunteer with JACKSONVILLE's ACPS' Animal Shelter, FRANCISCUS exercised her First Amendment right to speak upon matters of social and moral concern and document the events and the conditions at the Animal Shelter.

23.   Specifically, FRANCISCUS expressed her opinions that JACKSONVILLE, through its agents and employees, was neglecting or mistreating animals and grossly mismanaging the Animal Shelter.

24.   FRANCISCUS made these comments as a concerned member and citizen of the public, as a member of the community, and out of concern for the well-being of the animals under the care and custody of the Animal Shelter, a matter of public concern.

25.   On November 20, 2023, FRANCISCUS was terminated as a volunteer.

26.     The unjustified termination was an act of retaliation in response to FRANCISCUS's constitutional exercise of free speech regarding the Animal Shelter.

27.     The protected speech was a substantial and motivating factor in the adverse volunteer decision.

28.     FRANCISCUS was not provided an opportunity to contest her termination as a volunteer.

29.     On December 20, 2023, FRANCISCUS received a message from Michael Bricker informing her she was banned from the Animal Shelter altogether.

30.     FRANCISCUS was not provided an opportunity to contest her banishment before or after it was implemented.

31.     The unjustified banishment was an additional act of retaliation in response to FRANCISCUS's constitutional exercise of free speech regarding the Animal Shelter.

## IV.  SPECIFIC FACTUAL ALLEGATIONS OF RETALIATION

32.     In September of 2023, FRANCISCUS began volunteering at JACKSONVILLE ACPS's municipal pound/Animal Shelter.

33.     FRANCISCUS immediately observed inhumane conditions at the Animal Shelter, among them overcrowding, extremely cold temperatures in the kennels of the pens where dogs were housed, kennel walls and flooring smeared with feces

and urine and in some instances, blood, and a dearth of supplies such as soft dog food, high protein treats, and complete absence of blankets or other bedding materials.

34.    Shortly thereafter, FRANCISCUS, in an effort to obtain relief and assistance for the Animal Shelter, made a request on "Nextdoor," a social networking source for local neighborhoods, for donations of bedding to the Animal Shelter to help make the animals more comfortable during a cold snap.

35.    On or around November 8, 2023, Bricker commanded FRANCISCUS to a face-to-face meeting at which he reprimanded her for requesting donations from the public, having publicly posted about the Animal Shelter, and "being negative" about or having "negativity" toward the Animal Shelter, before warning that further negativity would result in her dismissal.

36.    On or around November 15, 2023, First Coast News, a local Jacksonville news agency, aired its "Special Investigation" report about the Animal Shelter. According to the report, the investigation included multiple visits to the Animal Shelter the previous week, video footage of the kennel conditions, as well as interviews of FRANCISCUS and a separate interview of Susan Blanyard, a woman who had recently adopted a dog from the Animal Shelter.  As stated by First Coast News:

> *First Coast News visited three times the week of November 6th [2023] and found dogs with multiple piles of feces in their kennels, some of*

*which was smeared on the kennel floors or walls. And we saw several cages that had a 'raw paw' designation with notes to keep the kennel dry and lined but were wet or dirty with smeared feces... 'raw paw' is abrasions on a dog's paw pads often from extensive activity on concrete...*

37.    In the newscast introduction, First Coast News reported that it had previously received multiple messages and complaints about the conditions of the Animal Shelter, "with one person calling the conditions 'deplorable'." Later in the newscast First Coast stated that conditions were "as described," and attributed the declaration of deplorable to Susan Blanyard.

38.    FRANCISCUS had been interviewed by First Coast News in early November, prior to her face-to-face meeting with Bricker. In her interview, FRANCISCUS, acting as a concerned citizen and a member of the community, and out of sincere and very legitimate concern for the physical and mental well-being of the animals under the care and custody of the Animal Shelter, expressed concerns regarding the Animal Shelter conditions, including those that were visually depicted in the First Coast News segment.

39.    At the time of her meeting with Bricker, FRANCISCUS did not know whether her interview would be included in the First Coast News report, or even if any of the segment about the Animal Shelter would even be aired.  After the report – which included her interview— aired,  FRANCISCUS feared that Bricker

would interpret it as Animal Shelter "negativity" and dismiss her as he had previously threatened only days earlier.

40.     To avoid a scene at or any interruption to the Animal Shelter, FRANCISCUS emailed Bricker on November 18, 2023: "*Please let me know your position on my returning as a volunteer...*" (11/18/2023 AF Volunteer Status Inquiry is marked and incorporated as "Exhibit 1.")

41.     On November 20, 2023, Bricker terminated FRANCISCUS:

> *We truly value your commitment to our cause, but we want to emphasize that we're looking for individuals who share our vision of collaboration and problem-solving. As I mentioned in our face to face meeting, to create a positive and effective team, it's crucial that everyone is aligned in their efforts to help, not hinder, our mission.*
>
> *While your dedication is appreciated, we haven't seen evidence of the collaborative spirit and solution-focused approach we aim for in our team. Here at Animal Care and Protective Services, we believe in working together to overcome challenges and and [sic] by doing that, we'll make a greater impact for the animals that we **all** care about.*
>
> *If in the future you're willing to embrace a more collaborative mindset and actively contribute to finding solutions, we would love to have you back on board. Please let Franny [Buffa] and I know if things change and if you're willing to work **together** to make a meaningful difference for the animals in our care.*

(11/20/2023 Termination Email is marked and incorporated as "Exhibit 2")[emphasis in original]).

9

42.   Also in November, 2023, but prior to her termination, FRANCISCUS was fostering a dog, "Frankie" (fka "Amber"), in her home because of the dog's special medical needs.

43.   In or around early December 2023 and after her termination, FRANCISCUS sought to adopt Frankie (convert from a foster arrangement to an adoption).

44.   On or around December 20, 2023, via voice mail message, Bricker banned FRANCISCUS from the Animal Shelter "property" in all capacities, including as a member of the general public and areas of public accommodation, claiming that she made "staff and volunteers uncomfortable." He also insisted that she "call him" to discuss her foster dog.

45.   In and before December 2023, the Animal Shelter's process for fostering or even adopting an animal did not include or require any individual discussion with the Animal Shelter Director.

46.   On December 21, 2023, FRANCISCUS requested that Bricker explain how she was purportedly making "staff and volunteers uncomfortable" and the reasons she had been "banned [as] a citizen from the public animal shelter":

> *Good morning. I would appreciate you outlining the reasons in writing- the specifics on how I am making staff and volunteers uncomfortable.*
>
> *Additionally, i [sic] would appreciate it if you would produce the guidelines for visiting the shelter and what*

> *would constitute reasons for banning a citizen from the*
> *public animal shelter to visit the dogs. I have never been*
> *disruptive when visiting the kennels. I have not engaged*
> *verbally with any staff or volunteers. I visit the dogs,*
> *provide them with approved Acps treats, then exit the*
> *premises. When bringing my foster in for medical*
> *appointments, I have sat in reception and made no*
> *attempt to engage with any staff or volunteers-with the*
> *exception of staff examining my foster. I await your*
> *responses. Thank you in advance.*

(12/21/2023 AF Email to Bricker is marked and incorporated as "Exhibit 3.")

47.    Bricker responded that day, but failed to provide the requested reason(s) or explanation as to why FRANCISCUS purportedly made "volunteers and staff uncomfortable," instead insinuating she had been unkind. Bricker also disregarded FRANCISCUS's request to communicate in writing, insisting that they "need[ed] to discuss her foster dog…" and directing that FRANCISCUS advise when would "be best for that call." Bricker back-pedaled from the original total banishment decree to a "not authorized in…areas…that are not public":

> *As I mentioned previously, I'd love to have a*
> *conversation with you when you're ready. Until*
> *then, you have been formally dismissed as a*
> *volunteer of Animal Care and Protective Services.*
> *You are no longer authorized in any areas of the*
> *shelter that are not public. You are not allowed to*
> *take animals in and out of the kennels, nor walk*
> *them on shelter property. If you do visit, we ask you*
> *to please be kind to all staff and volunteers, and*
> *please do not wear your ACPS Volunteer shirt.*
> ***On a separate but related note**, we need to*

11

> ***discuss your foster dog as well, today****. Please let me know a good time would be best for that call.*

(12/21/2023 Bricker Response is marked and incorporated as "Exhibit 4" [emphasis supplied].)

48.   FRANCISCUS replied:

> *I am very confused. Since being released as a volunteer, I have never worn my volunteer shirt, I have never taken a dog from a kennel, I have never gone in unauthorized staff or volunteer areas. You indicated in your voice mail that I am banned from the premises because I am making staff and volunteers uncomfortable. I need you to elaborate and clarify your statement. As I indicated previously, I have not engaged with any staff or volunteers since my dismissal. I request you put everything in writing so there are no misunications during communications.*
>
> *Regarding my foster, please indicate via email. Is there an issue? You have not indicated what my foster has to do with my dismissal or what the plan is moving forward…Please advise.*

(12/21/2023 AF Reply to Bricker is marked and incorporated as "Exhibit 5.")

49.   Despite FRANCISCUS's qualifications and dedication, and the dire need for volunteers at the Animal Shelter, JACKSONVILLE terminated FRANCISCUS as a volunteer at the Animal Shelter.

50.   FRANCISCUS's November 2023 termination from the Volunteer Program was rendered without veritable explanation for it or its abruptness.

51.   JACKSONVILLE did not take adhere to its own policy regarding corrective actions the Animal Shelter must take prior to terminating FRANCISCUS, as

required under the "Volunteer Performance Support Process" in the 2023

Volunteer Program Handbook:

**Volunteer Performance Support Process:**

1. Friendly Reminder of policies and procedures
2. Verbal Warning
3. Meeting with Supervisor or Volunteer/ Shelter Manager-written warning
4. Meeting with Volunteer Manager and Shelter Manager or Division Chief-2nd written warning
5. 2 week probation or change in volunteer assignment
6. Dismissal

(ACPS Volunteer Program Handbook 2023, Revised by Franny Buffa, ACPS

Manager of Volunteer Services 03/24/2023, excerpt is marked and incorporated

as "Exhibit 6.")

52.    FRANCISCUS's December 20, 2023, banishment from a place of public

accommodation was rendered without authority, veritable explanation, or

adherence to JACKSONVILLE's own written policy.

53.    Upon information and belief, JACKSONVILLE, without justification or

reason but in retaliation for FRANCISCUS's having exercised her freedom of

speech rights, endeavored to intentionally hinder, interfere, and obfuscate

FRANCISCUS'S adoption and/or fostering from the Animal Shelter.

54.    In November of 2023,  FRANCISCUS, acting as a concerned citizen and a

member of the community, and out of concern for the physical and mental well-

being of the animals under the care and custody of the Animal Shelter, expressed

concerns regarding the conditions of the Animal Shelter, through the following acts, including but not limited to: (a) posting about the Shelter's lack of supplies on social media and requesting donations for the Animal Shelter from the public; and (b) discussing the Animal Shelter's inhumane conditions with a First Coast News Reporter news reporter during an interview that was aired to the general public.

55.   In November 2023 FRANCISCUS was removed from her position as a volunteer at JACKSONVILLE ACPS's Animal Shelter without justification.

56.   The unjustified removal was an act of retaliation, in response to FRANCISCUS's constitutional exercise of free speech regarding the Animal Shelter.

57.   Bricker and Buffa substantially influenced JACKSONVILLE's decision to remove FRANCISCUS from the Volunteer Program, or otherwise caused FRANCISCUS to be removed.

58.   Specifically, Bricker and Buffa influenced the decision by falsely conveying to JACKSONVILLE that FRANCISCUS had "negativity" toward or about the Animal Shelter.

59.   Upon information and belief, Bricker and Buffa substantially influenced JACKSONVILLE's decision to ban FRANCISCUS from public accommodations.

60. Specifically, Bricker and Buffa influenced the decision by creating a false narrative that FRANCISCUS made volunteers and staff at the Animal Shelter "uncomfortable" and/or that FRANCISCUS had been unkind to them.

61. These allegations were concocted and lodged by Bricker and/or Buffa without any valid basis and despite FRANCISCUS's repeated requests for an example of anything she did or said that purportedly made volunteers or staff "uncomfortable" or clear explanation of what was meant by "negativity."

62. As documented in detail above, JACKSONVILLE terminated FRANCISCUS's position in the Volunteer Program in November of 2023 and banned FRANCISCUS from ACPS property in December of 2023 in retaliation for FRANCISCUS constitutional exercise of free speech regarding inhumane conditions at the Animal Shelter.

63. JACKSONVILLE continues to hinder and obfuscate FRANCISCUS efforts to foster, adopt, or rescue animals at the Animal Shelter, without cause or justification but in retaliation for FRANCISCUS constitutional exercise of free speech regarding inhumane conditions at the Animal Shelter.

64. As a direct and proximate cause of JACKSONVILLE's retaliatory actions detailed herein, FRANCISCUS has incurred damages, including the loss of the benefit of serving the community as an Animal Shelter volunteer, the temporary

loss of access to ACPS's property, and the humiliation of being terminated and then banned from a place of public accommodation.

65.    FRANCISCUS has retained undersigned counsel and has satisfied all conditions proceeding this litigation, or such conditions have been waived by Defendant.

## V.  LEGAL FRAMEWORK (FREE SPEECH & VOLUNTEERS)

66.    FRANCISCUS brings this cause of action against JACKSONVILLE for deprivation of her constitutional rights afforded by the First Amendment and protected against intrusion by the States under the Fourteenth Amendment, within the meaning of 42 U.S.C. § 1983.

67.    The First Amendment to the United States Constitution guarantees that no State shall abridge the freedom of speech. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 500–501 (1952).

68.    Freedom of speech protected by the First Amendment is among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action. *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938).

69.    The First Amendment "embraces at the least the liberty to discuss publicly and truthfully all matters of public concern." *Thornhill v. Alabama*, 310 U.S. 88, 101–102 (1940); *see Mills v. Alabama*, 384 U.S. 214, 218 (1966).

70.     Freedom of speech is "indispensable to the discovery and spread of political truth." *Whitney v. California*, 274 U.S. 357, 375 (1927).

71.     The First and Fourteenth Amendments remove "governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity…" *Cohen v. California*, 403 U.S. 15, 24 (1971).

72.     "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The Court has sought to protect the right to speak in this spatial context." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

73.     "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear.  It is cyberspace — the 'vast democratic forums of the Internet' in general, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868, 117 S. Ct. 2329, 138 L.Ed.2d 874 (1997), and social media in particular." *Id.* at 1735.

74.     Social media offers "relatively unlimited, low-cost capacity for communication of all kinds." *Reno* at 870. On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos. On LinkedIn, users can look for work, advertise for employees, or review

tips on entrepreneurship. And on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose. In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics "as diverse as human thought." *Reno*, at 870, 117 S.Ct. 2329 (internal quotation marks omitted); *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (internal briefing citations omitted).

75.   Governmental benefits and privileges can only be denied in a manner that comports with the First Amendment. *Rodin v. City of Coral Springs*, 229 Fed. Appx. 849, (11th Cir. 2007); *Hyland v. Wonder*, 972 F.2d 1129, 1136 (9th Cir. 1992).

76.   42 U.S.C. § 1983 protects government employees **and volunteers** from retaliatory actions inflicted after the employee or volunteer exercises his/her First Amendment rights. *See Pickering v. Bd. of Ed. Of Township High Sch. Dist.*, 391 U.S. 563 (1968) (holding that when a person in the uniquely informed class speaks, "it is essential that they be able to speak out freely [. . .] without fear of retaliatory dismissal." *Rodin*, 229 Fed. Appx. 849 (11th Cir. 2007); *Hyland*, 972 F.2d 1129, 1136 (9th Cir. 1992).

## VI. CAUSE OF ACTION

## (42 U.S.C. § 1983 FIRST AMENDMENT RETALIATION)

77.   FRANCISCUS re-alleges and incorporates by reference Paragraphs 1 through 76 as if fully set forth herein.

78.   FRANCISCUS brings this cause of action against JACKSONVILLE for deprivation of her constitutional rights afforded by the First Amendment, within the meaning of 42 U.S.C. § 1983.

79.   FRANCISCUS's position as a volunteer at the Animal Shelter was terminated in a manner that violates the First Amendment.

80.   While volunteering for JACKSONVILLE's Animal Shelter, FRANCISCUS exercised her First Amendment right to freedom of speech through being interviewed on local news and by utilizing social media to bring awareness to the inhumane conditions at, and thus JACKSONVILLE's gross mismanagement of, the Animal Shelter.

81.   At all times relevant hereto, FRANCISCUS spoke truthfully as a concerned citizen, and not out of a duty to an employer.

82.   The subject matters of which FRANCISCUS constitutionally exercised her free speech were of public concern because the content was truthful and related to social and moral concerns of the community, specifically, the inhumane conditions at, and JACKSONVILLE's gross mismanagement of, the municipal Animal Shelter.

83.    FRANCISCUS's volunteer status placed her within a uniquely informed class of people that have first-hand knowledge regarding the Animal Shelter's operation and conditions.

84.    Accordingly, the interest of protecting her First Amendment right outweighs any interest of JACKSONVILLE's in curtailing the truthful content of her speech.

85.    JACKSONVILLE, through its agents and employees, including but not limited to Bricker and/or Buffa, unlawfully retaliated against FRANCISCUS by:

    a.    terminating her opportunity to volunteer with the Animal Shelter on November 18, 2023;

    b.    banning her from the Animal Shelter on December 20, 2023;

    c.    substantially and wrongfully attempting to interfere with FRANCISUCS's adoption of an animal from the Animal Shelter; and

    d.    the close temporal proximity between the termination and her protected speech, thus demonstrating causation.

86.    At all times material hereto, the agents and employees of JACKSONVILLE mentioned herein were acting under color of state law, statutes, ordinances, and/or regulations and were of such position and authority that their actions may fairly be said to constitute the official expressions of JACKSONVILLE.

87.    Further, JACKSONVILLE's agents and employees, including but not limited to Bricker and  Buffa, possessed decision making authority at the Animal Shelter.

88.    At all times material hereto, JACKSONVILLE, through its agents and employees, were and are aware that retaliating against a person for truthfully speaking about matters of public concern is prohibited under the First Amendment of the United States Constitution.

89.    JACKSONVILLE's retaliation against Plaintiff was willful, intentional, malicious, and done with a reckless indifference to the Plaintiff's constitutional rights, thus warranting an award of punitive damages against JACKSONVILLE.

90.    Further, JACKSONVILLE's termination of FRANCISCUS, through its agents and employees, was unlawful as the decision was substantially related to her protected speech, evidenced by:

    a. the close, temporal proximity between the publication of the First Coast News interview and FRANCISCUS's termination; and

    b. Bricker's statements in his November 18th and December 20, 2023, email communications to FRANCISCUS

    c. Bricker's message informing FRANCISCUS she is banned from the municipal ANIMAL SHELTER including portions open to the general public.

91. Further, JACKSONVILLE's termination of FRANCISCUS, through its agents and employees, was unlawful as the decision was substantially related to her protected speech.

92. Further, JACKSONVILLE cannot justify terminating FRANCISCUS as the termination would not have been issued, absent her truthful protected speech.

93. As a result of JACKSONVILLE's violation of FRANCISCUS'S right to free speech, FRANCISCUS has suffered and continues to suffer irreparable harm.

**WHEREFORE**, Plaintiff, ALISON FRANCISCUS, respectfully requests an Order of Judgment against Defendant, JACKSONVILLE:

a. Declaring that JACKSONVILLE violated 42 U.S.C. § 1983;

b. Directing JACKSONVILLE to reinstate ALISON FRANCISCUS as a volunteer;

c. Enjoining JACKSONVILLE from implementing any restrictions preventing ALISON FRANCISCUS from engaging as a volunteer;

d. Awarding the recovery of fair and reasonable damages to Plaintiff, including punitive damages, as well as reasonable attorney's fees and costs; and

e. Any and all additional relief this Court deems proper.

## VII.  DEMAND FOR JURY TRIAL

Plaintiff further demands a trial by jury of all causes of action triable as a right by jury.


RESPECTFULLY SUBMITTED,

*s/Denese Venza*    *s/ Marcy I. LaHart*

Denese Venza Esq.    Marcy I. LaHart, Esq.
Florida Bar No. 599220   Florida Bar No. 0967009
Email: dvenza@venzalawpllc.com Email: marcy@floridaanimallawyer.com

VENZA LAW, PLLC    MARCY I. LAHART, P.A.
931 Village Blvd., #905-322  249 SE Tuscawilla Road
West Palm Beach, FL 33409  Micanopy, FL 32667
Office: (561) 596-6329   Office: (352) 224-5699/Fax: (888) 400-1464
*Counsel for Plaintiff*    *Counsel for Plaintiff*