UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ALISON FRANCISCUS,

       Plaintiff,

v.                                   Case No. 3:24-cv-00212-HES-PDB

CITY OF JACKSONVILLE, FLORIDA,
a political subdivision created
pursuant to the Florida Constitution
and laws of the State of Florida,

       Defendant.

_____ /

## AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, ALSION FRANCISCUS ("Plaintiff" and/or "FRANCISCUS"), by and through undersigned counsel, and files this civil action and respectfully requests this Court to issue injunctive relief and damages for violations of the United States Constitution perpetrated by Defendant, CITY OF JACKSONVILLE, FLORIDA ("Defendant" and/or "JACKSONVILLE" and/or "CITY") and alleges in support:

## INTRODUCTION

1. This is a complaint for damages brought pursuant to 42 U.S.C. §§ 1983 and 1988 seeking damages, declaratory relief, and injunctive relief against JACKSONVILLE for enacting and maintaining unconstitutional polices, patterns

and practices in violation of Plaintiff's First Amendment Rights and for retaliating against her for exercising her free speech rights.

## PARTIES

2.     Plaintiff, ALISON FRANCISCUS ("FRANCISCUS"), is a natural person and resident of Keystone Heights, Florida.

3.     Defendant, CITY OF JACKSONVILLE, FLORIDA, ("JACKSONVILLE") is a political subdivision of the State of Florida.

## JURISDICTION AND VENUE

4.     This action is brought pursuant to 42 U.S.C. §§ 1983, 1988, and the First and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction under, and by virtue of 28 U.S.C. §§ 1331, 1343 to order an injunction, declaratory judgment, compensatory damages, attorney's fees and court costs, expenses, pre-judgment and post-judgment interest, and any other legal and/or equitable relief this Court deems appropriate.

5.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) as the Defendant exists in this District and the events that give rise to Plaintiff's claims arose in this District.

## FACTUAL ALLEGATIONS

6.     Jacksonville Animal Care and Protective Services ("ACPS"), is a division of JACKSONVILLE's Administrative Services Department.

7.     ACPS operates Jacksonville's Animal Care and Protective Services Center ("Animal Shelter") at 2020 Forest Street, Jacksonville, FL 32204.

8.     The Animal Shelter is funded by public dollars from JACKSONVILLE's budget.

9.     The Animal Shelter houses and cares for JACKSONVILLE's stray, abandoned, and neglected dogs and cats and offers pet adoptions to the public.

10.    The management of and conditions at the Animal Shelter are and have been a subject of public concern and public debate in the Jacksonville area.

11.    At all times material hereto, Michael Bricker ("Bricker") was an employee of JACKSONVILLE holding the supervisory title of "Chief "of ACPS.

12.    At all times material hereto, Bricker had managerial responsibility and decision-making authority and final policy making authority for the Animal Shelter.

### ACPS Volunteer Program

13.    ACPS relies upon volunteers to assist with caring for animals housed at the shelter and to assist with other tasks related to operation of the Animal Shelter.

14.    Volunteers are non-compensated workers and often donate their time due to their individual love of animals and desire to improve the lives of the animals within the Animal Shelter.

15.    Volunteers can donate their time in a variety of roles, some of which include walking, handling and playing with animals housed at the Animal Shelter.

16.    Other volunteer positions involve roles such as writing bios for adoption websites and social media to promote pet adoption, greeting Animal Shelter visitors, and assisting with off-site adoption events.

17.    The Animal Shelter has a roster of approximately 400 unpaid volunteers, although currently only about 60 are active.

18.    According to Bricker:

> The dedication and passion of our volunteers are the lifeblood of our organization. They provide invaluable support and care for the animals, helping us to create a nurturing and safe environment. Without their selfless contributions, we wouldn't be able to achieve our mission of cultivating a community rooted in compassion and service that safeguards the wellbeing of humans & animals alike.[1]

19.    Also at all times material hereto, Franny Buffa ("Buffa") was an employee of JACKSONVILLE working at the Animal Shelter as the Manager of Volunteer Services and set policies and practices for Shelter volunteers.

20.    Prospective Animal Shelter volunteers participate in the volunteer program by passing , a background screening and attending a one-hour information session which includes a shelter tour.

*Volunteer Code of Conduct and Volunteer Confidentiality Agreement*

---

[1] https://www.jacksonville.gov/acpsvolunteer (last visited September 15, 2024).

21.    Prospective volunteers are also required to sign two documents, a "Volunteer Confidentiality Agreement," and a "Volunteer Code of Conduct" as a condition of serving as a volunteer at the Animal Shelter. These unconstitutional adhesion contracts are marked and incorporated as "Exhibit 1" and "Exhibit 2," respectively.

22.    Volunteers for other JACKSONVILLE divisions are not required to sign such restrictive confidentiality and conduct agreements.

23.    The Confidentiality Agreement, *inter alia,* prohibits volunteers from publicly releasing "*any information relating to the operation of the agency that is not known or readily accessible to the public.*" Exhibit 1.

24.    The Confidentiality Agreement also states: "*I understand that any unauthorized release of photographs taken in or around ACPS can result in dismissal from the volunteer program.*" *Id.*

25.    Volunteers can be "*immediate[ly] dismissed*" for violating the Confidentiality Agreement. *Id.*

26.    The Code of Conduct, *inter alia,* mandates that volunteers "*agree to follow ACPS [Shelter] policies and procedures at all times during [his/her] volunteer service*" and "*promise not to engage in any activity or communication that may cause harm to the reputation of ACPS [Shelter].*" Exhibit 2.

27.    The Code of Conduct requires signatories to "*promise not to engage in any activity of communication that may cause harm to the reputation of ACPS,*" and to acknowledge that he or she "*can be removed at any time at the discretion of the Manager of Volunteer Services, Division Chief or Department Director.*" *Id.*

28.    Volunteers can also be "*immediately dismissed*" for violating the Code of Conduct. *Id.*

29.    It is JACKSONVILLE's policy, custom, and/or practice that anyone who refuses to sign either the Code of Conduct or Confidentiality Agreement cannot become an Animal Shelter volunteer.

*Volunteer Program Handbook*

30.    Volunteers are provided a "Volunteer Program Handbook"("Handbook") which outlines JACKSONVILLE's official "Policies and Procedures" for Animal Shelter volunteers. The ACPS Volunteer Program Handbook is marked and incorporated as "Exhibit 3."

31.    At the time of ACPS Information Session, Volunteers are required to sign a Sign-In Sheet stating that he/she received a copy of the Handbook regardless of whether he/she actually did.

32.    The Code of Conduct requires prospective volunteers to acknowledge they are responsible for reviewing the Handbook.

33.    The Handbook also states that "*Volunteers understand that there is a zero-tolerance for breach of confidentiality regarding disclosure of confidential information. A breach in any format of the confidentiality policy will result in immediate dismissal*." *Id.*

34.    Among JACKSONVILLE's "policies" outlined in the Handbook is that "[*a*]*ny information regarding the euthanasia status of a particular animal, __or in general__, must be confirmed with the…Shelter Manager…or Division Chief prior to posting*" and that "*__any__ content*" that is shared on the Shelter's closed Facebook Group Pages cannot be "*shared outside…without management approval*." *Id.* (emphasis added).

35.    The Handbook also contains the official ACPS Social Media Policy, which forbids volunteers from posting "Urgent" posts, i.e., posts about animals potentially facing euthanasia without approval of the Shelter Manager. *Id.*

36.    The Handbook also contains the official ACPS policy that volunteers "*will not take into the public realm photographs of ACPS property, grounds or common areas such as the volunteer office without express written permission*." *Id.*

37.    The Handbook further states the ACPS policy that volunteers "*will not engage in any activity or communication that may cause harm to the reputation of ASPC.*" *Id.*

### *FRANCISCUS's Participation in and Ouster from the Volunteer Program*

38.    FRANCISCUS is an animal welfare advocate who volunteers her time to save the lives of neglected, abused, and homeless dogs and cats, and to improve

the lives of sheltered animals during their periods of confinement at animal shelters.

39.    FRANCISCUS volunteered at the Animal Shelter from September 2023 to November 2023.

40.    FRANCISCUS derived feelings of satisfaction and community involvement from being able to help care for, exercise and socialize JACKSONVILLE's homeless dogs and cats, but also feelings of deep sorrow and despair because of the inhumane conditions she observed at the Animal Shelter.

41.    FRANCISCUS observed overcrowding, extremely cold temperatures in the cages where dogs were housed, kennel walls and flooring smeared with feces and urine and in some instances, blood, and a dearth of supplies such as soft dog food, high protein treats, and a complete absence of blankets or other bedding materials.

42.    On or about October 21, 2023, FRANCISCUS was told by an ACPS employee to please push to get an older dog named Fancy adopted because she was on the euthanasia list.

43.    On or about October 23, 2023, FRANCISCUS posted a message on "Nextdoor," a social networking source for local neighborhoods, asking for someone to please foster "Fancy," because FRANCISUS had been told by an ACPS employee that Fancy was on the euthanasia list. (10/23/2023 AF Post is marked and incorporated herein as "Exhibit 4.")

44.    FRANCISUS was alerted by other ACPS volunteers and a former volunteer that she would be fired as a volunteer for posting about Fancy.

45.    On Tuesday, October 24, 2023, FRANCISCUS emailed Buffa:

> *Franny, I put out a plea for someone to at least foster or take Fancy out for a day. I was told she was on the euthanasia list. One of my neighbors filled out a foster application for her and I wanted to see if there was a way you could check to see if it was received. I would hate myself if she was euthanized before she got the chance to get out of there. Thanks for all you do.*

46.    On October 25, 2023, FRANCISCUS sent another email to Buffa, who had recently returned from leave:

> *Hope you got some restful days. I was told by several people messaging me that I was going to be dismissed as a volunteer. I'd rather tell you in person so I can explain. If I am going to be let go, I'd rather have my side heard also.*

47.    Buffa placed a call to FRANCISCUS on speaker phone with Bricker in the room to discuss the post.

48.    Bricker said that volunteers cannot post about dogs scheduled for euthanasia because, according to his logic, "it takes away from the over 300 other dogs needing homes."

49.    At no time while FRANCISCUS was a volunteer did either Bricker or Buffa communicate to FRANCISCUS that Fancy was not scheduled to be euthanized or that FRANCISCUS's post contained "misinformation."

50.    On or about November 5, 2023, FRANCISCUS, after a particularly frustrating day volunteering at the Animal Shelter, posted on Nextdoor that the dogs runs containing over 100 dogs were very cold, nothing had been done about it, and that although she had brought in 100 full-sized blankets the proceeding Saturday "specifically to make sure the dogs in those runs had something to keep them warm. Today, NO BLANKETS."

51.    In her post she implored people "who care about our forgotten pets" to email the Mayor of Jacksonville and provided the Mayor's email address.

52.    On November 7, 2023, when FRANCISCUS reported for her volunteer shift to walk dogs she was intercepted by ACPS employee Destiny Styles, who shepherded her immediately to Bricker's office.

53.    FRANCISCUS was scolded by Bricker for having publicly posted about the Animal Shelter and "being negative" about, or having "negativity" toward, the Animal Shelter.

54.    In the November 7, 2023, meeting, Bricker informed FRANCISCUS that ACPS did not need blankets, as it had a shed full of them.

55.    Bricker warned FRANCISCUS that further "negativity" would result in her dismissal.

56.     On or around November 16, 2023, First Coast News, a local Jacksonville news agency, aired a "Special Investigation" report about the Animal Shelter. [2]

57.     According to the report, the investigation included multiple visits to the Animal Shelter the previous week, video footage of the kennel conditions, as well as interviews of FRANCISCUS and a separate interview of Susan Blanyard, a woman who had recently adopted a dog from the Animal Shelter.

58.     The interview with FRANCISCUS had been taped weeks earlier, prior to FRANCISCUS having been admonished by Bricker on November 7th for her "negativity" towards the Animal Shelter.

59.      As stated by First Coast News:

> *First Coast News visited three times the week of November 6th [2023] and found dogs with multiple piles of feces in their kennels, some of which was smeared on the kennel floors or walls. And we saw several cages that had a 'raw paw' designation with notes to keep the kennel dry and lined but were wet or dirty with smeared feces… 'raw paw' is abrasions on a dog's paw pads often from extensive activity on concrete…*

60.     In the newscast introduction, First Coast News reported that it had previously received multiple messages and complaints about the conditions of the Animal Shelter, "with one person calling the conditions 'deplorable'." Later in the

---

[2] https://www.firstcoastnews.com/article/life/animals/first-coast-news-investigates-kennel-concerns-at-animal-care-and-protective-services/77-c60c2706-4ae6-4ed7-8ffe-84a2974ab275 (last visited September 21, 2024).

newscast First Coast stated that conditions were "as described," and attributed the declaration of "deplorable" to Susan Blanyard.

61.    Bricker and Buffa were aware of FRANCISCUS's First Coast News interview.

62.    Bricker was forced to publicly respond to First Coast New's inquiry regarding conditions at the Animal Shelter.

63.    Given the reactions to her prior social media posts, one of which merely sought a foster home for a shelter dog and the other lamenting about the lack of blankets for dogs in non-climate controlled cages, FRANCISCUS fully expected to be terminated as a volunteer after her First Coast News interview aired, so she proactively emailed Bricker two days later on November 18, 2023:

> *Please let me know your position on my returning as a volunteer. Lucy[3] will have a lot more free time through December and if my services are no longer wanted, I can make arrangements for her to arrive earlier and stay later during the week.*

64.    Bricker responded via email two days later on November 20, 2023, confirming FRANCISCUS's suspicion that she would no longer be allowed to volunteer at the Animal Shelter:

> *We truly value your commitment to our cause, but we want to emphasize that we're looking for individuals who share our vision of collaboration and problem-solving. As I mentioned*

---

[3] Lucy is FRANCISCUS's granddaughter who also volunteered at the Animal Shelter.

> *in our face to face meeting, to create a positive and effective*
> *team, it's crucial that everyone is aligned in their efforts to*
> *help, not hinder, our mission.*
>
> *While your dedication is appreciated, we haven't seen*
> *evidence of the collaborative spirit and solution-focused*
> *approach we aim for in our team. Here at Animal Care and*
> *Protective Services, we believe in working together to*
> *overcome challenges and and [sic] by doing that, we'll make a*
> *greater impact for the animals that we **all** care about.*
>
> *If in the future you're willing to embrace a more*
> *collaborative mindset and actively contribute to finding*
> *solutions, we would love to have you back on board. Please let*
> *Franny [Buffa] and I know if things change and if you're*
> *willing to work **together** to make a meaningful difference for*
> *the animals in our care.*

(11/20/2023 Termination Email is marked and incorporated as "Exhibit 5" (emphasis in original)).

65.    Bricker's  statement to FRANCISCUS that "*[if] in the future you're willing to embrace a more collaborative mind set and actively contribute to finding solutions, we would love to have you back on board*" clearly communicated that FRANCISCUS was, as of November 20,  2023,  no longer "on board" with the Volunteer Program. *Id.*

66.     Accordingly, FRANCISCUS has not attempted to volunteer at the Animal Shelter since November 20, 2023.

67.    Any reasonable person would construe Bricker's 11/20/2023 email as ending FRANCISCUS's tenure as a volunteer.

68.     While a volunteer with JACKSONVILLE's ACPS' Animal Shelter, FRANCISCUS exercised her First Amendment right to speak out regarding the conditions at the Animal Shelter,  matters of public concern.

69.     FRANCISCUS made these comments as a private citizen and member of the public, as a member of the Jacksonville community, and out of concern for the well-being of the animals under the care and custody of the Animal Shelter, a matter of public concern.

70.     Commenting about Animal Shelter conditions was not part of or pursuant to FRANCISCUS's responsibilities or duties as a volunteer.

71.     Despite FRANCISCUS's qualifications and dedication, and the dire need for volunteers at the Animal Shelter, FRANCISCUS was removed as a volunteer at the Animal Shelter, on November 20, 2023, five days after the First Coast News story aired.

72.     The unjustified termination was an act of retaliation in response to FRANCISCUS's constitutional exercise of free speech regarding the Animal Shelter.

73.     FRANCISCUS's protected speech was the motivating factor in the adverse volunteer decision.

74.     FRANCISCUS's November 2023 ouster from the Volunteer Program was rendered without veritable explanation for it or its abruptness.

75.    FRANCISCUS was not provided any opportunity to contest her ouster as a volunteer.

76.    JACKSONVILLE did not adhere to its own policy regarding corrective actions the Animal Shelter must take prior to terminating FRANCISCUS, as required under the "Volunteer Performance Support Process" in the 2023 Volunteer Program Handbook:

**Volunteer Performance Support Process:**

1. Friendly Reminder of policies and procedures
2. Verbal Warning
3. Meeting with Supervisor or Volunteer/ Shelter Manager-written warning
4. Meeting with Volunteer Manager and Shelter Manager or Division Chief-2nd written warning
5. 2 week probation or change in volunteer assignment
6. Dismissal

(Excerpt from Volunteer Program Handbook is marked and incorporated herein as "Exhibit 6.")

77.    In contravention of JACKSONVILLE's own written policy, custom, and/or practice, at no time did Bricker, Buffa, or anyone else at the Animal Shelter suggest or offer FRANCISCUS a different volunteer role at the Shelter.

78.    On November 22, 2023, FRANCISCUS, after being terminated as a volunteer, visited the Animal Shelter with a friend as a member of the public to check on some of her favorite dogs and distribute dog treats to the dogs.

79.    Although the dogs at the shelter were regularly provided treats from visitors, FRANCISCUS was accosted by an animal control officer who informed FRANCISCUS that she was not allowed to give the dogs treats.

80.    FRANCISCUS felt uncomfortable after the confrontation and immediately left the Animal Shelter.

81.    The Animal Control Officer, Sarah Anne Duran, emailed Bricker and other ACPS employees that she had "*observed two women with open bags of treats going into one of the runs*." (11/22/2023 Durnan Email and subsequent responses are collectively marked and incorporated as "Exhibit 7.")

82.    She closed her email stating:

> *This is not the first time I have noticed this and had to tell a person. I was sending this email so the rest of the staff can be made aware that they should say something if they see something in the future, of course if you all agree.*

*Id.*

83.    Shelter Manager Marcy Gallo followed up on Sarah Anne Duran's email by informing Bricker that "*the people passing out treats were Allison Franciscus and her friend*." *Id.*

84.    Bricker responded "*Oh wow. **That makes it even worse**.*" *Id.* (Emphasis added.)

### FRANCISCUS's "Formal Dismissal" from the Volunteer Program

85. On December 13, 2023, at 9:27 AM FRANCISCUS sent an email under the subject line "CONGRATULATIONS!!!" to multiple JACKSONVILLE administrators criticizing the absence of funding allocated to ACPS. The email included depictive photographs of ACPS dogs in their runs at the Shelter, and invited recipients to "[t]ake a look…while all of you all can go back to your nice comfortable homes, our homeless ACPS pets live in darkness and squalor." FRANCISCUS also posted on NextDoor inviting all to "email city council and the mayor." (12/13/2023 AF Email, NextDoor post, photos, and subsequent responses are collectively marked and incorporated herein as "Exhibit 8.")

86. FRANCISCUS further asserted:

> I was dismissed as a volunteer because I had the audacity to go public with the utter deficiencies and horrendous conditions at our city run shelter. It appears that the city would rather hide the truth from the public and pretend the horrible conditions do not exist. I am not going away…The pictures of these dogs are not going away… *Id.*

87. That email was ultimately forwarded to Kelli O'Leary, the Deputy Chief Administrative Officer to JACKSONVILLE Mayor Deegan, that same day (i.e., December 13th) at 2:40 PM who, three minutes later, forwarded it to Bricker in an email stating:

> FYI. This is one of our regular citizens that provides her opinion. If we need to meet on this we can tomorrow **to game plan** after our 1pm. I assume these are older pics?

*Id.* (emphasis added).

88.   On December 20, 2023, although FRANCISCUS had not been a volunteer for a month and had not been at the Animal Shelter since being scolded for passing out treats on November 22, 2023, except to bring her foster dog to medical appointments, FRANSICUS received a voicemail from Bricker informing FRANCISCUS that she was "not allowed on shelter property" "until we can have a conversation."

89.    In the voicemail message Bricker reported that Buffa was present and then alleged that "*our staff are uncomfortable*" and "*the volunteers are uncomfortable*" and directed that FRANCISCUS could return her volunteer shirts but that she should "*not wear them on the property especially*."

90.   Also on December 20, 2023, Buffa, under Bricker's direction and approval, published an email to eleven Animal Shelter employees under the subject line "Volunteer Dismissal" stating:

> *Allison (sic) Franciscus has been formally dismissed. She is no longer authorized in any areas of the shelter that are not public. She is not authorized to take animals in or out of the kennels or walk them on shelter property. Please alert me, Mike or Marcy if she creates any problems.*

(12/20/2023 Buffa Email broadcasting FRANCISCUS's Formal Termination  is marked and incorporated as "Exhibit 9.")

18

91.     On December 21, 2023, FRANCISCUS requested via email that Bricker

explain how she was purportedly making "*staff and volunteers uncomfortable*" and

the reasons she had been "*banned [as] a citizen from the public animal shelter*":

>  *Good morning. I would appreciate you outlining the*
>  *reasons in writing- the specifics on how I am making*
>  *staff and volunteers uncomfortable.*
>
>  *Additionally, i [sic] would appreciate it if you would*
>  *produce the guidelines for visiting the shelter and what*
>  *would constitute reasons for banning a citizen from the*
>  *public animal shelter to visit the dogs. I have never been*
>  *disruptive when visiting the kennels. I have not engaged*
>  *verbally with any staff or volunteers. I visit the dogs,*
>  *provide them with approved Acps treats, then exit the*
>  *premises. When bringing my foster in for medical*
>  *appointments, I have sat in reception and made no*
>  *attempt to engage with any staff or volunteers-with the*
>  *exception of staff examining my foster. I await your*
>  *responses. Thank you in advance.*

(12/21/2023 AF and Bricker Email chain exchange regarding AF's request for

termination reason is collectively marked and incorporated as "Exhibit 10.")

92.     Bricker responded that day but ignored FRANCISCUS's request to provide

the reason(s) or explanation as to why FRANCISCUS purportedly made

"volunteers and staff uncomfortable," instead insinuating she had been "unkind."

Bricker also disregarded FRANCISCUS's request to communicate in writing,

insisting that they "need[ed] to discuss her foster dog…" and directing that

FRANCISCUS advise when would "be best for that call":

> As I mentioned previously, I'd love to have a
> conversation with you when you're ready. Until
> then, you have been formally dismissed as a
> volunteer of Animal Care and Protective Services.
> You are no longer authorized in any areas of the
> shelter that are not public. You are not allowed to
> take animals in and out of the kennels, nor walk
> them on shelter property. If you do visit, we ask you
> to please be kind to all staff and volunteers, and
> please do not wear your ACPS Volunteer shirt.
> On a separate but related note, we need to
> discuss your foster dog as well, today. Please let me know a good
> time would be best for that call.

*Id.*

93.    FRANCISCUS replied:

> I am very confused. Since being released as a volunteer, I
> have never worn my volunteer shirt, I have never taken a
> dog from a kennel, I have never gone in unauthorized staff
> or volunteer areas. You indicated in your voice mail that I
> am banned from the premises because I am making staff
> and volunteers uncomfortable. I need you to elaborate and
> clarify your statement. As I indicated previously, I have not
> engaged with any staff or volunteers since my dismissal. I
> request you put everything in writing so there are
> no misunderstandings during communications.
>
> Regarding my foster, please indicate via email. Is there an issue?
> You have not indicated what my foster has to do with my
> dismissal or what the plan is moving forward…Please advise.

*Id.*

94.    Bricker never responded to FRANCISCUS's emails asking for clarification

regarding how she was allegedly making volunteers and staff uncomfortable.

95.     FRANCISCUS's repeated requests for an example of anything she did or said that purportedly made volunteers or staff "uncomfortable" or clear explanation of what was meant by "negativity" were wholly ignored.

96.     FRANCISCUS has yet to receive any formal notice or explanation as to the grounds for her termination as a volunteer, or her subsequent "formal dismissal."

97.     FRANCISCUS was never provided a formal opportunity to contest her termination from the volunteer program.

98.     As documented in detail above, JACKSONVILLE removed FRANCISCUS from the Volunteer Program on November 20, 2023, and then "formally dismissed" her for unexplained reasons on December 20, 2023, in retaliation for FRANCISCUS's constitutional and private exercise of free speech regarding matters of public concern, specifically the conditions at the Animal Shelter.

99.     Being fired from her volunteer position at the Animal Shelter has caused FRANCISCUS to suffer anxiety, distress, feelings of regret and sorrow arising from both her concern for the animals housed at the Animal Shelter and the loss of her ability to serve her community.

100.    As a direct and proximate cause of JACKSONVILLE's retaliatory actions detailed herein, FRANCISCUS has incurred damages, including the loss of the benefit of serving the community as an Animal Shelter volunteer, the temporary

loss of access to ACPS's property, and the humiliation of being terminated and then banned from the Animal Shelter.

101.   FRANCISCUS has retained undersigned counsel and has satisfied all conditions proceeding this litigation, or such conditions have been waived by Defendant.

## LEGAL CLAIMS

### Count I:  First Amendment Retaliation for the Exercise of Protected Speech

102.   FRANCISCUS re-alleges and incorporates by reference Paragraphs 1 through 101 as if fully set forth herein.

103.   FRANCISCUS brings this cause of action against JACKSONVILLE for deprivation of her constitutional rights afforded by the First Amendment, within the meaning of 42 U.S.C. § 1983.

104.   JACKSONVILLE has an official policy, by and through Division Chief Michael Bricker, of terminating volunteers who speak publicly "in a manner that cause harm to the reputation of ACPS."

105.   What constitutes or causes "harm to the reputation of ACPS" is left wholly to the arbitrary and excessive discretion of JACKSONVILLE.

106.   Bricker is the formal policy maker and final decision maker as it relates to dismissing volunteers.

107.    Bricker implemented an official policy to prevent volunteers from being able to speak or post information publicly if Bricker thinks it casts the Animal Shelter in a bad light.

108. JACKSONVILLE violated the First Amendment by preventing FRANCISCUS from continuing to volunteer at the Animal Shelter based solely upon her protected speech.

109. FRANCISCUS's position as a volunteer at JACKSONVILLE's Animal Shelter constituted a valuable governmental benefit, including the benefits of serving her community by partnering with a government organization.

110.    Governmental benefits and privileges can only be denied in a manner that comports with the First Amendment. *Rodin v. City of Coral Springs*, 229 Fed. Appx. 849 (11th Cir. 2007); *Hyland v. Wonder*, 972 F.2d 1129, 1136 (9th Cir. 1992).

111.    42 U.S.C. § 1983 protects government employees **and volunteers** from retaliatory actions inflicted after the employee or volunteer exercises his/her First Amendment rights. *See Pickering v. Bd. of Ed. Of Township High Sch. Dist.*, 391 U.S. 563 (1968) (holding that when a person in the uniquely informed class speaks, "it is essential that they be able to speak out freely […] without fear of retaliatory dismissal.") *Rodin*, 229 Fed. Appx. 849 (11th Cir. 2007); *Hyland*, 972 F.2d 1129, 1136 (9th Cir. 1992).

112.    Government officials may neither punish a person for expressing disfavored views nor deny him access to otherwise available government benefits or opportunities. *Connick v. Myers*, <u>461 U.S. 138, 144</u> (1983). The government may not deny a benefit on these grounds "even if [the person] has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, <u>570 U.S. 205, 214</u> (2013) (quotation omitted); *Perry v. Sindermann*, <u>408 U.S. 593, 597</u> (1972) ("[E]ven though the government may deny [a] benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes . . . his interest in freedom of speech."). This includes denial of "the opportunity to serve as a volunteer" in a government program. *Hyland v. Wonder*, <u>972 F.2d 1129, 1135</u> (9th Cir. 1992); accord *Mosely v. Bd. of Educ. of Chi.*, <u>434 F.3d 527, 534</u>–35 (7th Cir. 2006); *Andersen v. McCotter*, <u>100 F.3d 723, 727</u> (10th Cir. 1996).

113.    FRANCISCUS had a protected First Amendment right to speak to the press and to express her opinions on matters of public concern.

114.    While volunteering for JACKSONVILLE's Animal Shelter, FRANCISCUS engaged in acts of constitutionally protected speech by speaking about and being interviewed concerning a matter of public concern, conditions at the Animal Shelter.

115.    Before her formal dismissal from the Animal Shelter, FRANCISCUS engaged in additional acts of protected speech and petitioning her government by

emailing JACKSONVILLE administrators and sharing photographs of the Animal Shelter conditions, a matter of public concern.

116.    At all times relevant hereto, FRANCISCUS spoke truthfully as a private citizen, and not out of any duty to an employer or to the Animal Shelter.

117.    FRANCISCUS's volunteer status placed her within a uniquely informed class of people that have first-hand knowledge regarding the Animal Shelter's operation and conditions.

118.    Accordingly, the interest of protecting FRANCISCUS's First Amendment rights outweighs any interest of JACKSONVILLE's in curtailing the truthful content of her speech.

119.    JACKSONVILLE, through its agents and employees, including but not limited to Bricker and/or Buffa, unlawfully retaliated against FRANCISCUS by terminating her from her position as an Animal Shelter volunteer.

120.    The interview in which FRANCISCUS mentioned the conditions at the Animal Shelter aired on November 16, 2023, four days before she received an email from Bricker terminating her as an Animal Shelter volunteer.

121.    The temporal proximity between the public airing of Franciscus's television interview and her termination as a volunteer reinforces that her protected speech was the motivating factor in her termination.

122. The email and photographs FRANCISCUS sent to JACKSONVILLE administrators which found its way to JACKSONVILLE's Mayor's Director and inspired the Director's curt instructions to Bricker three minutes later to meet "*to game day*" on the matter was less than four (4) business days before Bricker decided to suddenly declare that FRANCISCUS had been "formally dismissed."

123. The temporal proximity between FRANCISCUS's email criticizing CITY administration for the absence of Animal Shelter funding in the pictorial face of inhumane conditions and the CITY's sudden decision to circulate – Shelter-wide -- an announcement that she had been "formally dismissed" underscores that her protected speech was the motivating factor in her "formal" termination and its dissemination.

124. At all times material hereto, the agents and employees of JACKSONVILLE mentioned herein were acting under color of state law, statutes, ordinances, and/or regulations and were of such position and authority that their actions may fairly be said to constitute the official expressions of JACKSONVILLE.

125. Further, JACKSONVILLE's agents and employees, including but not limited to Bricker and Buffa, possessed decision-making authority at the Animal Shelter.

126. At all times material hereto, JACKSONVILLE, through its agents and employees, were and are aware that retaliating against a person for truthfully

speaking about matters of public concern is prohibited under the First Amendment of the United States Constitution.

127. Had it not been for Plaintiff's exercise of her free speech rights, JACKSONVILLE would not have terminated her from the Volunteer Program.

128. Further, JACKSONVILLE's termination of FRANCISCUS, through its agents and employees, was unlawful as the decision was substantially-related to her protected speech, evidenced by:

      a. the close, temporal proximity between the airing of the First Coast News interview and FRANCISCUS's termination;

      b. the close, temporal proximity between FRANCISCUS's December 13th email criticizing the CITY and the announcement of her "formal" termination; and

      c. Bricker's statements in his November 20th email and December 20, 2023, voicemail and email communications to FRANCISCUS and his December 13, 2023, email communication from CITY staff.

129. Further, JACKSONVILLE's termination of FRANCISCUS, through its agents and employees, was unlawful as the decision was substantially related to her protected speech.

130. JACKSONVILLE cannot justify terminating FRANCISCUS as the termination would not have been issued, absent her truthful protected speech.

131.    As a result of JACKSONVILLE's violation of FRANCISCUS's right to free speech, FRANCISCUS has suffered and continues to suffer irreparable harm.

132.    As a result of JACKSONVILLE's unlawful actions, Plaintiff has been forced to retain counsel and has incurred and will continue to incur legal costs and fees and, therefore, is entitled to an award of attorneys' fees and costs, as provided by 42 U.S.C. § 1988.

133.    FRANCISCUS has suffered from JACKSONVILLE's adverse conduct, including humiliation, embarrassment, and banishment from the Volunteer Program, which would likely deter a person of ordinary firmness from engaging in such speech or similar speech.

*Count II:  First Amendment Retaliation for the Exercise of Protected Speech*

134.    FRANCISCUS re-alleges and incorporates by reference Paragraphs 1 through 101 as if fully set forth herein.

135.    JACKSONVILLE denies FRANCISCUS was dismissed from the Volunteer Program on November 20, 2023, for "dissemination regarding Shelter conditions including before or after the television news piece" and claims FRANCISCUS was still a volunteer until she was formally dismissed on December 20, 2023, "*due to inappropriate, harassing, and disruptive behavior that violated ACPS's volunteer policies*" "*including the dissemination of false information*" and because her "*online conduct and*

*continued presence at the shelter created extreme distress to employees and other volunteers.*"

136.   When pressed at his August 29, 2024, deposition as JACKSONVILLE's corporate representative to be more forthcoming regarding the true reasons for FRANCISCUS's termination from the Volunteer Program, Bricker asserted for the first time that the conduct by FRANCISCUS that constituted "*inappropriate, harassing, and disruptive behavior that violated ACPS's volunteer policies*" was violating the social media policy and a "*separate policy*" against the spreading of false information. (Bricker 8/29/2024 Deposition Transcript Excerpt is marked and incorporated as "Exhibit 11.")

137.   FRANCISCUS's ultimate "formal dismissal" for conduct code and social media policy violations was in in retaliation for her protected speech which allegedly caused Destiny Stiles and others to suffer emotional distress as well as discomfiture to the CITY's administration.

138.   FRANCISCUS had a protected First Amendment right to express her opinions on matters of public concern, including ACPS's euthanasia policies, ACPS's employees, and Shelter conditions.

139.   FRANCISCUS brings this cause of action against JACKSONVILLE for deprivation of her constitutional rights afforded by the First Amendment, within the meaning of 42 U.S.C. § 1983.

140.   JACKSONVILLE has an official policy, by and through Division Chief Michael Bricker, of dismissing volunteers who speak publicly "in a manner that causes harm to the reputation of ACPS."

141.   Other volunteers, including Sara Militallo, have been formally dismissed by JACKSONVILLE for exercising their free speech rights.

142.   Bricker is the formal policy maker and final decision maker as it relates to dismissing volunteers.

143.   JACKSONVILLE retaliated against FRANCISCUS by "formally dismissing" her as volunteer at the Animal Shelter based solely upon her protected speech.

144.   FRANCISCUS's position as a volunteer at JACKSONVILLE's Animal Shelter constituted a valuable governmental benefit, including the benefits of serving her community by partnering with a government organization.

145.   JACKSONVILLE, through its agents and employees, including but not limited to Bricker and/or Buffa, unlawfully retaliated against FRANCISCUS by "formally dismissing" her from her position as an Animal Shelter volunteer because she violated the social media policy and code of conduct.

146.   At all times material hereto, the agents and employees of JACKSONVILLE mentioned herein were acting under color of state law, statutes, ordinances, and/or regulations and were of such position and authority that their actions may fairly be said to constitute the official expressions of JACKSONVILLE.

147.   Further, JACKSONVILLE's agents and employees, including but not limited to Bricker and Buffa, possessed decision-making authority at the Animal Shelter.

148.   At all times material hereto, JACKSONVILLE, through its agents and employees, were and are aware that retaliating against a person for truthfully speaking about matters of public concern is prohibited under the First Amendment of the United States Constitution.

149.   Had it not been for Plaintiff's exercise of her free speech rights, JACKSONVILLE would not have "formally dismissed" her from the Volunteer Program.

150.   Further, JACKSONVILLE's "formal dismissal" of FRANCISCUS, through its agents and employees, was unlawful as the decision was substantially related to her protected speech.

151.   JACKSONVILLE cannot justify "formally dismissing" FRANCISCUS as she would not have been" formally dismissed" absent her truthful protected speech.

152.   As a result of JACKSONVILLE's violation of FRANCISCUS's right to free speech, FRANCISCUS has suffered and continues to suffer irreparable harm.

153.   As a result of JACKSONVILLE's unlawful actions, Plaintiff has been forced to retain counsel and has incurred and will continue to incur legal costs and fees

and, therefore, is entitled to an award of attorneys' fees and costs, as provided by

42 U.S.C. § 1988.

### Count III:  Unlawful Prior Restraint on Free Speech

154.    FRANCISCUS re-alleges and incorporates by reference Paragraphs 1 through 101 as if fully set forth herein.

155.    JACKSONVILLE has a policy and custom of requiring prospective animal shelter volunteers to sign adhesion agreements that chill their free speech rights, or they will not be allowed to volunteer.

156.    JACKSONVILLE also has a policy, custom, and/or practice of deterring volunteers from criticizing ACPS and/or of taking and sharing photographs that portray Shelter conditions as they exist but which portray the Shelter in a bad light.

157.    The "Volunteer Code of Conduct" that prospective volunteers must execute requires "promising not to engage in any activity of communication that may cause harm to the reputation if ACPS."

158.    The "Volunteer Code of Conduct" also required prospective volunteers to acknowledge they are responsible for reviewing the "new volunteer handbook" which contains many other unconstitutional restraints of free speech.

159.    The "Volunteer Confidentiality Agreement" that is mandatory for would be volunteers to "recognize that any and all information shared with me as part of my duties as a volunteer is confidential and shall not be divulged to unauthorized

individuals, agencies or organizations," notwithstanding the fact that most of the categories of information listed as confidential in the volunteer handbook are matters of public record.

160.   The "Volunteer Confidentiality Agreement" also contains the statement "I understand that any unauthorized release of photographs taken in or around ACPS can result in dismissal from the volunteer program."

161.   The "Volunteer Confidentiality Agreement" does not stop at restricting volunteers' First Amendment right to document and disseminate information regarding conditions and activities at a publicly funded facility, the Agreement purports to impose a duty to "correct when possible, misleading or inaccurate information and representations made by others concerning ACPS policies, practices and procedures."

162.   The Volunteer Confidentiality Agreement and/or Code of Conduct and/or Volunteer Handbook, together and/or jointly, act as a prior restraint on expression before the expression occurs because they restrict would-be volunteers and volunteers from engaging in expression without government approval.

163.   The Volunteer Confidentiality Agreement and/or Code of Conduct and/or Volunteer Handbook, together and/or jointly, impose content and speaker-based restrictions on protected speech.

164.   The First Amendment imposes on the government (or a party asking the government to censor speech) a heavy burden of proving both that the government has a compelling interest in restricting speech and that the desired restriction is narrowly tailored to that interest.

165.   It is well-settled law that a government agency cannot condition public employment, as a paid employee or volunteer, on a basis that infringes upon the constitutionally-protected interest in freedom of expression.

166.   JACKSONVILLE's policy of requiring prospective volunteers to sign adhesive agreements that force volunteers to sacrifice their ability to speak out regarding Animal Shelter operations and conditions, or to even share pictures taken at the Animal Shelter before they will be allowed to volunteer, is unconstitutional.

167.   JACKSONVILLE's motivations in conditioning the ability to volunteer upon acquiescing to a code of silence are to chill free speech rights by squelching criticism of ACPS policies, particularly regarding conditions at the Animal Shelter and destruction of animals.

168.   FRANCISCUS is not the only person to be dismissed as a volunteer because she exercised her free speech rights.

169.   Knowing that one's right to volunteer will be terminated if one shares pictures or other information about Animal Shelter conditions, or policies, or

expresses an opinion that "may cause harm to the reputation of ACPS" (or is arbitrarily construed as "causing harm" as determined at JACKSONVILLE's unbridled discretion), will and does have a chilling effect on free speech.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor on each of her respective claims and against Defendant as follows:

A) Compensatory damages in an amount that will fully and fairly compensate the Plaintiff for her injuries, damages, and losses pursuant to 42 USC § 1983;

B) Pre and post judgment interest;

C) Reasonable attorneys' fees and the cost of this action pursuant to 42 USC § 1988 and other applicable law;

D) A declaration that the Defendant's policy of forcing prospective volunteers to sign the Code of Conduct, and Confidentiality Agreement as a condition of volunteering violates the First and Fourteenth Amendments to the U.S. Constitution as set forth in this Complaint;

E) Injunctive relief prohibiting the Defendant's implementation of policies that infringe upon any individual's constitutionally-protected interests in freedom of expression; and

F)  Any other and further relief as this Court finds proper.

**DEMAND FOR JURY TRIAL**

Plaintiff further demands a trial by jury of all causes of action triable as a right by jury.

RESPECTFULLY SUBMITTED,

*s/Denese Venza*
Denese Venza Esq.
Florida Bar No. 599220
Email: dvenza@venzalawpllc.com

VENZA LAW, PLLC
12161 Mercado Drive, #227
Venice Beach, FL 34293
Office: (561) 596-6329
*Counsel for Plaintiff*

*s/ Marcy I. LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Email: marcy@floridaanimallawyer.com

MARCY I. LAHART, P.A.
249 SE Tuscawilla Road
Micanopy, FL 32667
Office: (352) 224-5699/Fax: (888) 400-1464
*Counsel for Plaintiff*